22-2831 Western Arkansas Maria Murguia v. Charisse Childers Good morning judges. I represent Maria Murguia, the plaintiff in this matter. May it please the court, your honors, counsel, this case is about a material dispute of fact on the sole contested issue, whether Maria Murguia, a Spanish-speaking Mexican immigrant, was intentionally discriminated against by the Arkansas Division of Workforce Services in violation of Title VI. A reasonable jury could infer that DWS's failures were motivated, at least in part, by her national origin. Based here on the two years of exclusion she endured, four categories of intent evidence Maria put forward, and two cases decided in the last two years by this court, Bernstein and Siegel. The district court here usurped the role of the jury when it, respectfully, when it improperly discounted important evidence of intent, failed to look at the totality of Murguia's evidence on the whole, and attributed nondiscriminatory motives that DWS itself never even asserted. Now the language barriers that were erected by DWS here ultimately led to Maria having a year-long delay in her receipt of benefits, a loss of $1,800 in lost wages assistance benefits that are no longer available to her, and she went through a year-long fraud investigation and appeals as a result. Now through discovery, Ms. Murguia identified four groups of evidence from which we believe on the totality a reasonable jury could infer intent. The first is comparative data that was brought out in the complaints submitted by both Spanish-speaking claimants and English-speaking claimants that we presented in the record. These demonstrate both that Spanish-speaking claimants complain more frequently and complain of a different type of access barrier than that experienced by their English-speaking peers. Second, over 20 violations of longstanding regulations in the record. Now notably, both the 20 violations and the complaints submitted here were sufficient to survive a summary judgment in Siegel, which was just very recently decided by this court. But we also present two other categories of evidence here from which intent could be gathered under an Arlington Heights framework. The third is the un-American comment. UI executive, when referencing the obligations of the agency to provide its language services under these longstanding regulations, referred to that obligation in nakedly nationalistic terms and I quote, this is so un-American. Now fourth, the final category of evidence that we presented was the Michoud evidence. And that is that the agency knew of the danger presented by this hostile worker who had a history of complaints against him, including specifically of national origin discrimination. The agency received these complaints as well as the Department of Labor investigation findings that found that his office that he initially ran as a manager was out of compliance with Title VI. Agency did nothing and in fact placed him at the front desk where he would later mistreat Maria, refuse to take her pay stubs and ultimately delay her claim. Now on the whole, these four groups of evidence applying either the Arlington Heights totality test or the deliberate indifference framework rejected by the district court, Maria has certainly presented evidence of intent here. At least sufficient to get to a jury. Yet the district court below identified and agreed ultimately that the agency was consistently out of compliance with Title VI and said that he couldn't think of a reason for why Michoud was continuing to work at that agency. But despite these concessions, the district court ultimately ruled against us because it took these pieces of evidence and reviewed them in an individual manner. The district court failed to look at all of that evidence in its totality. Now the district court also in addition to this. Let's talk about Michoud for a second. You agree that there's no vicarious liability under Title VI? Yes, Your Honor. So that has to be evidence of the agency's intent to discriminate? Absolutely, Your Honor. Is there evidence that the agency, its leadership knew about any discriminatory acts he may have engaged in? Yes, Your Honor. Specifically, there were actually multiple managers that were aware of Michoud's misconduct through the complaints. But the most direct person with knowledge that clearly had an authority to respond is Gloria Johnson, the agency's equal opportunity manager, who was responsible for the agency's compliance with WIOA, Title VI, and various other discrimination obligations as well. So it was certainly on notice of the agency's obligations. But she received the complaints that were made against Michoud, including the complaint by Employee 1, specifically of national origin discrimination. She also received the investigation findings from the Department of Labor from its 2015 and 2016 investigation. And yet she herself signed the hiring paper with Michoud that placed him at the front desk and allowed him to discriminate against Ms. Verghia. Now, additionally, the district court below failed to account for or really even grasp with some important evidence in the record. And one of those is that Employee 1 made that complaint not just about sexual harassment that she had endured, but she made multiple complaints in the record of national origin discrimination specifically. And that wasn't really dealt with by the district court. The in his decision whatsoever. And then, in addition to that, the district court also applied these justifications that the agency never even itself asserted and certainly didn't meet its burden of production here. Now... Is that... It seems like the analysis is a little bit blended. When you say justifications, are we really talking about sort of non-discriminatory reasons for the conduct? How are we to look at that? Well, Your Honor, specifically the district court asserted two justifications as potential justifications for DWS's conduct. The first was computer errors. I'm sorry, an out-of-date computer system. And the second was COVID-19 more broadly. With regard to the computer errors, DWS never even asserted that that was an issue. They never said that that prevented them from doing anything. And in fact, we had an agency worker, the LEP coordinator Karina Parra, who testified that it was possible for it to be notated in Maria's record that she needed these services, that she was Spanish-speaking, but that that was never done. And so when you talk of justifications, help me understand where that falls within the analysis because we talk of, did you make a prima facie case? And then what are the reasons? So can you help me understand where your term justifications falls into the analysis? Certainly, Your Honor. It would be at point two and point three with the burden of production being on DWS to assert those non-discriminatory motives. And then after that, pretext on us. So you're not talking about something different when you say justifications? That's correct, Your Honor. All right. Counsel, your argument relies pretty heavily on two regulations, 28 CFR 42-104 and 42-405. Can you tell me under which section of Title VI those were promulgated? And the reason it matters is that if they were under the wrong section, they can't be used in terms of a private cause of action. Your Honor, even if they were promulgated under Section 602, they are still valuable for agency-defining power. And it's clear that Congress granted... So which section were they promulgated under? I don't recall, Your Honor. But even if they were promulgated under 602, it's still important and still valuable. In what way? Well, first of all, Your Honor, it would be required to be given deference under the Chevron deference for the regulations. Only if they were under the right subsection? Your Honor, I don't believe that there is a reason to only give deference for that purpose. But even if they are not granted Chevron deference specifically, the appellee has admitted within least owed Skidmore persuasive deference. And even then, given that the agency has also adopted the regulations and their specific requirements into its own language access plan, it is certainly... Would that basically overrule our decision in Alexander v. Sandoval? No, Your Honor. All that Alexander did was add this intent element. So the agency's power to define was not affected by Alexander. The agency is still allowed to define what national origin discrimination is. All that Alexander did was add this intent element. So as long as under the agency's definition or under just from the text of Title VI, we would still believe that we make a case based off of the language there, forbidding exclusion or denial of benefits on the basis of national origin. I think we've said in the past that there's a distinction between national origin and language. Your Honor, would you be referring to Moomin? Yes. Yes. So we distinguish Moomin on three bases here. The first being that it would apply to a very specific factual scenario that's nothing like the case here. Moomin, in fact, didn't involve language access barriers whatsoever. The court there looked at whether it was facially discriminatory when a school required that students that were recent immigrants be at the school for at least three years before they could go through special education testing if needed. And the court said that there was theoretically a reason that that could have been done for a non-discriminatory purpose. Second, unlike in Moomin, we have those regulations here, which, again, are owed deference at least. If not Chevron, then owed Skidmore deference on defining power. And third, there's no evidence that— What are they defining if they're not promulgated under 602? They're defining national origin discrimination specifically. For purposes of a private cause of action? For purposes of any action. All that Alexander did, Your Honor, was add that intent element. It didn't change the agency's power to define what is a violation of Title VI. But going back to your previous question on Moomin, we also differentiate from Moomin because Moomin didn't cite Lao. We have this longstanding Supreme Court precedent that says there is a strong link between national origin discrimination and language, and that was certainly not abrogated by Lao. If you have no further questions, I'd like to reserve the rest of my time for rebuttal. Very well. Thank you. May it please the Court. In lieu of an opening, I'd like to just address the four categories of evidence that plaintiffs relied on today. And I'll start with the regulations. So, Judge Graz, you were right in your suggestion that these are 602 regulations. The agencies that give funding under Title VI have power to implement 601's prohibition of intentional discrimination with prophylactic disparate impact regulations. And those regulations are, the Court has assumed in Sandoval, the Supreme Court are valid, and we haven't challenged these language access regulations here. But they do not interpret what intentional discrimination means under 601. And so they don't get Chevron deference as an interpretation of 601, and plaintiffs can't sue to enforce them under 601. That is, in fact, the holding of Sandoval. In Sandoval, Alabama refused to give their driver's license test in any language but English, and that violated Department of Transportation Title VI regulations. The plaintiffs claimed that also violated 601 and was intentional discrimination. The lower court said that was wrong, but it violated the regulations. The Supreme Court then held you cannot sue to enforce these regulations. And so it would essentially collapse Sandoval to say, oh, but any violation of these regulations is ipso facto evidence of discriminatory intent that gets you to a jury, or at least you need to get an explanation of why you're violating the regulations. That said, if you thought that absent an explanation for violations of the regulations, you do get to a jury that that is prima facie evidence of discriminatory intent. There was testimony about why these regulations were unintentionally violated. First of all, Workforce Services does not have a policy of violating these regulations. It's had a settlement agreement with Department of Labor to try to comply with them. Department of Labor then approved of their compliance efforts and closed administrative complaints on their violations. But violations do unintentionally occur, and the primary class of violations was sending English language forms to the plaintiff when the agency knew at some point that she spoke Spanish. That is because, as Ms. Parra explained in her deposition from about page 90 to page 95, while they have a front-facing application system that you can apply in Spanish and that will send you back Spanish language forms, their older case management system that they have to use if there's a problem with the claim is not able yet to disaggregate applicants by the language in which they speak and send them the appropriate forms. It will just always generate English language forms, and the agency has tried to address that problem by hard coding Spanish notices into the middle of these forms that everybody gets, whether or not they speak English or Spanish, so that if you receive a notice of benefit determination from this agency and you speak English, you will nevertheless see a large paragraph in Spanish saying this is an important form, you need to get it translated, you may have a right to appeal, etc. So that's the regulations. Then I'd like to go to, sorry. On the documents, there are a lot of documents at issue here, and she had a lot of contact, I don't know, how many documents are we talking about? There's a couple of dozen anyway. I think that's right. That explanation seems to perhaps carry some weight once or twice, but when you have someone who, presumably you know, needs it in Spanish, to continually just say, well the machine won't do it, the computer won't do it, is that at least a fact question? Is that something that can be just adopted whole cloth as well, so therefore no intent? So I don't think there's any dispute of Now, could there be a human workaround where you print out the document, you nevertheless say, oh, but this person speaks Spanish, we need to go pick up a form out of a folder? That may be possible. And there were also some that, some significant, what did they call the major documents? I can't remember the phraseology, but they just weren't translated in Spanish at all, and it seems to me that again, you might stumble upon one form that you need, and all right, yeah, we've got to get on that, and you know, limited resources to do this sort of thing, but when you've got a few that everyone considers significant that weren't, at a minimum, does that turn it into a fact question for a jury to find? No, Your Honor, and two responses on that. So one, just as a factual matter, the reason those several documents out of the many that have been translated or not is because those are the ones generated by this very system. They're not preset forms that contain the same, you know, sentences, but rather they are reasons for your claim being denied, and the system generates these forms. It says various things about why your claim might be denied, and it's incapable of translating those explanations into different languages, and that's testified to at page 93 of PARA's deposition. But also, legally, I would point out that the agency told the Department of Labor, you asked us to translate our vital forms, and here's a checklist of the ones we translated, and then there are missing checks for these, and the Department of Labor says, yes, you've complied with our regulations, you've complied with this agreement, we're done, we're dismissing our complaints. So it would be very surprising if that, in the agency's view, compliance with the disparate impact regulations nevertheless translates into discriminatory intent in an implied cause of action. If I could turn to the... I'm sorry, can I just follow up as a factual matter? You're saying the Department of Labor said, it's okay not to have these three vital, thank you for giving me that phrase, vital documents translated into another language? The Department of Labor responded to our report, 1301 to 1310 of the appendix, with a letter that says, yes, you've complied fully with the settlement agreement which demanded that you translate your vital forms, and we're no longer... Okay, even though you hadn't, that was the stamp of approval you got? Yeah, yeah. I'd like to talk about the comparative data that they've discussed, and my friend said that there was both a qualitative and a quantitative difference. I don't think there's a quantitative difference. These complaints by people who do not speak English take the form of lengthy emails, and so they take up more pages of the record, but if you actually count them, they are not much more numerous or more numerous at all than the number of calls made by English-speaking people to the hotline. As for a qualitative difference, we may just read the complaints differently, but what I see are people saying to the language access coordinator, I need help. I need you to help me with my claim. When I went into the office, there were not Spanish-speaking people, but I've been told that you can help me, and then she responds and assists them. That's not evidence of the agency's disinterest or much less discrimination against this class of people, but rather they're trying to help these claimants and those people got help. And I'd also say as a legal matter, they've relied on Siegel, and they've said this kind of comparative analysis can be evidence of discriminatory intent, but as Mr. Weiss was just saying a moment ago, the ADA isn't really a discriminatory intent statute, and Siegel was an ADA case. What Siegel said is that this kind of comparative analysis can show that you have a lack of equal access under the ADA, and if this were an equal access statute, you didn't need to This kind of evidence would at least be probative, but just pointing to a statistical disparity without more, we think is not enough. Though again, there's no statistical disparity if you actually break out the numbers and compare these two classes of claims. Then the un-American comment. So if you look at page 2207 of the appendix, I think it really belies my friend's in this email is that Workforce Services is discussing their settlement with the Department of Labor, and there's a list of edits that Workforce Services wanted made. The Department of Labor said no to these edits, and then there are comments on them. And so the first two, the Workforce Services administrator says those are okay, we don't mind. The last one was a request that the agreement say you don't have to prove violations of the regulations themselves in order to enforce this agreement. You only need to show a violation of the agreement in order to enforce the agreement and revoke funding. And she says of this particular edit, this is so un-American. Apparently viewing it as denying the agency due process. There's no comment in the negotiation of the settlement that what the Department of Labor is asking for generally is un-American. And I think the lack of any resentment in these negotiations that they were able to obtain via discovery as to what the Department of Labor was seeking speaks powerfully that this agency was not resisting having to provide language access services. Finally, as to Michoud, I believe his name is pronounced, there really is no evidence that the agency knew that Michoud harbored any kind of discriminatory attitudes towards members of different national origin. And I'll talk specifically about Employee 1 made a sexual harassment complaint. And then there's a paragraph at the bottom of her complaint that they rely on. And that paragraph says two things. It says one, there are TAA specialists, Trade Adjustment Assistance specialists, who are being rude to Spanish-speaking applicants. The Trade Adjustment Assistance specialists were not supervised by Mr. Michoud. Employee 1 actually testified to that in her deposition, that these are people who just worked out of the office but weren't under the supervision of Workforce Services. So her saying that those people had been rude is not evidence of his discriminatory attitudes. Second, she complains that Spanish-speaking applicants were being asked to sign forms. And if they did not sign forms, they would have to come back with somebody who would interpret. There, she's just complaining about the Department of Labor requirement that you sign a form to allow the agency to speak with an interpreter. And if they don't, you can't speak with that interpreter. Now, it does also speak to a lack of interpreters at that time, which was the gravamen in the Department of Labor's complaint. The Workforce Services were relying on relatives who were coming in to help interpret what the agency was saying to those applicants. But that was a generalized problem that the agency had as a whole, and that was why we entered into a settlement agreement with the Department of Labor. So that complaint doesn't show that the agency could have known that he was discriminating on the basis of national origin. I'd also say as to the standard with Mr. Michoud Gebser interpreting Title IX, which is materially identical to Title VI, says that the agency actually needs actual notice of an employee's discriminatory conduct in order to be held liable for that employee's conduct. It's not enough that they could have predicted that employee's conduct. So even if you view that evidence as giving rise to an inference when they rehired him, that they could have known that he would discriminate, it wouldn't suffice because they did not have actual notice that he was engaging in the kind of conduct that they allege. If there are no further questions, I'd ask the court to affirm. Hearing none, thank you. Thank you. A few points briefly, Your Honors. First, I'll note that my opposing counsel here has gone through a lot of very specific facts and thoughts around what individual statements might have meant or whether notice was actually given by certain facts in the record. I'll remind this court that we are at summary judgment. We are on a case-by-case basis. We are not going to all reasonable inferences, and if we are going to argue the facts here, that's not the appropriate venue. We need to get to a jury. Second, I'll note that we have precedent here in this case from Meegly that ADA and Rehab Act claims both require intentional discrimination post-Sandoval. Both require discriminatory intent, and the courts freely analogize between the definitions of discriminatory intent and the potential frameworks to get to that. There's no reason to distinguish Siegel on that basis. Third, regarding the deference issue, I want to emphasize that even if we don't get to Chevron deference here, even if we don't get to our deference, the appellee has admitted that we are at least owed Skidmore deference. That persuasive value of the regulations, which go into significant detail around the reasons that these things are important, why specific measures are necessary to ensure that claimants aren't being discriminated against, that is still owed deference. They were adopted by DWS in its own language access plan, admitting that these are reasonable constructions, that this is reasonable and that they were required to do so. Their I'll also note that in Bernston, there was a similar regulatory framework and Chevron and our deference was applied there. Additionally, again in Siegel, the violations of regulations weren't even reviewed for deference. That wasn't an issue in Siegel. They just looked at whether they were violating the regulations and whether there was notice in the record through those complaints. Certainly, there was notice here as well with at least seven notices in the record of her need, and yet the agency continued sending notices in English, continued failing to offer her an interpreter, etc. Now, regarding the issue of the computer out-of-date system, there is no support in the record for the claims that opposing counsel made here about the specific failures of the computer system, that it cannot, for someone who has gone and applied in person, cannot result in someone receiving Spanish language notices. In fact, Maria received three Spanish language notices, which absolutely contradicts the statements made by opposing counsel on that point. Now, if they had asserted that in testimony, we would have certainly questioned and followed up on that to get a pretext, but they have a burden here of a clear and reasonably specific justification for their actions, non-discriminatory motive. That burden was not met. Now, I also want to touch briefly on the 2019 letter. I see that my time has expired, but just briefly. The 2019 letter didn't go into the specifics of whether the agency was in compliance with Title VI into the future. It didn't look at the actual on-the-ground changes that the agency was made, and in the language access plan that it reviewed, the agency still committed to updating all of its vital documents into Spanish, not just the ones that it had already done. Its failure to do that was certainly not approved of by the Department of Labor. Now, under either the Arlington Heights or deliberate indifference framework, we believe that you could find for us. Can we ask that you overturn the district court? Thank you. Thank you, counsel. Court appreciates your arguments. Case is submitted, and we'll issue an opinion in due course.